**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Newport News Division

NATHANIEL THOMAS,

                Plaintiff,

v.                                   ACTION NO. 4:14cv105

CAROLYN W. COLVIN,
*Commissioner of Social Security*
*Administration*,

                Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Plaintiff, Nathaniel Thomas, brought this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Acting Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying plaintiff's claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act.

An order of reference dated January 5, 2015, assigned this matter to the United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia. ECF No. 6. The Court recommends that plaintiff's motion for summary judgment (ECF No. 9) be DENIED, defendant's motion for summary judgment (ECF No. 11) be GRANTED, and the decision of the Commissioner be AFFIRMED.

# I. PROCEDURAL BACKGROUND

Plaintiff, Nathaniel Thomas, filed an application for DIB on February 8, 2011, alleging disability since October 29, 2009, due to "individual unemployability," bilateral pes planus (flat foot) with heel spurs, left wrist tendonitis, a lumbosacral strain, lumbar degenerative disc disease, post-traumatic stress disorder ("PTSD"), and sleep apnea.  R. 144-45, 177[1]; *Thomas v. Colvin*, No. 4:12cv179, 2013 WL 5962929, at *2 (E.D. Va. Nov. 6, 2013).  The Commissioner denied plaintiff's applications initially on June 3, 2011, R. 84-86, and upon reconsideration on July 29, 2011.  R. 90-92.  At plaintiff's request, an Administrative Law Judge ("ALJ") heard the matter on February 27, 2012.  R. 31.  At the hearing, plaintiff appeared via video teleconference, represented by counsel.  R. 31.  On April 9, 2012, the ALJ found that plaintiff was not disabled under the Social Security Act, and denied his DIB claim.  R. 12-23.  On September 25, 2012, the Appeals Counsel denied plaintiff's request for review of the ALJ's decision.  R. 1-5.

On November 26, 2012, plaintiff filed an action in this Court for judicial review pursuant to 42 U.S.C. § 405(g).  On September 11, 2013, United States Magistrate Judge Douglas E. Miller issued a report and recommendation, which Chief United States District Judge Rebecca Beach Smith adopted on November 6, 2013.  *Thomas*, 2013 WL 5962929.  The Court vacated the decision of the Commissioner and remanded the case for further consideration "in light of the changes in law concerning [plaintiff's] disability rating, and its impact on [his] claim for benefits."  *Id.* at *10.

Pursuant to this order, the ALJ conducted a second administrative hearing on March 25, 2014.  R. 531-58.  Plaintiff appeared in person with counsel.  R. 533.  An impartial vocational expert also testified.  R. 533.  On April 7, 2014, the ALJ issued a decision finding that plaintiff

---

[1] The citations in this Report and Recommendation are to the administrative record.

had not been under a disability, as defined in the Social Security Act, from October 29, 2009, through the date of the decision. R. 490-510. On June 30, 2014, the Appeals Counsel denied plaintiff's request for administrative review. R. 469-72. Accordingly, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (2012); 20 C.F.R. §§ 404.981, 416.1481 (2014).

On August 18, 2014, plaintiff timely filed this action for judicial review pursuant to 42 U.S.C. § 405(g). In response to the Court's order, the parties filed motions for summary judgment, with supporting memoranda, on February 4, 2015 and March 6, 2015, respectively. ECF Nos. 9-12. As neither party has identified special circumstances requiring oral argument, the case is deemed submitted for a decision based on the filings.

## II. RELEVANT FACTUAL BACKGROUND

### A. Plaintiff's Background

Plaintiff was born in 1965 and was 44 years old on October 29, 2009, the onset date of his alleged disability. R. 177, 536. Plaintiff completed college and received a Bachelor of Arts degree in sociology at Saint Leo's University in March 2012. R. 537-38. Plaintiff is a veteran of the first Gulf War, and served on active duty in the United States Army from October 3, 1985 to March 31, 2006, as a transportation specialist. R. 42-43, 144, 163. He retired with the rank of sergeant, first class. R. 42. After his service, plaintiff worked as an independent truck driver until 2008 when he could no longer pass the required physical examination. R. 304, 410. He then operated his own trucking business until October 2009. R. 145.

On September 21, 2009, the Department of Veterans Affairs ("VA") issued a disability rating decision finding that plaintiff had the service-connected disabilities of PTSD, gastroesophageal reflux disease ("GERD"), residual-facial laceration, sleep apnea, degenerative

3

disc disease, hypertension, residual-right biceps injury, and left ankle sprain.  R. 396-97.

Nonetheless, the VA initially denied plaintiff's request for entitlement to "individual

unemployability" because he had not been found "unable to secure or follow a substantially

gainful occupation as a result of service connected disabilities."  R. 411.  On January 7, 2011, the

VA increased plaintiff's "combined service-connected disability evaluation" to 100 percent

effective September 17, 2010 and found him unemployable.  R. 393.

### B.  Relevant Medical Record

*1.  Plaintiff's Physical Impairments*

On January 22, 2010, Leroy Graham, Jr., M.D., Ph.D., ("Dr. Graham"), who does not

work for the VA, examined plaintiff and reported paraspinal lumbar tenderness and decreased

range of motion in plaintiff's back, but no clubbing or edema in his extremities.  R. 244.  Dr.

Graham noted plaintiff's hypertension, but specified that it was under "good control" with

plaintiff's current management.  R. 244-45.  Dr. Graham recommended that plaintiff continue to

take Percocet for back pain and attend meetings at the VA for PTSD.  R. 245.

On March 26, 2010, plaintiff underwent a magnetic resonance imaging test ("MRI") that

showed hemangioma of L1, sub annular bulge at the L3-4 level with a focal disc herniation on

the left, and a small sub annular bulge at the L5-S1 level on the left.  The MRI, however,

revealed no acute findings.  R. 302.

On April 22, 2010, Dr. Graham treated plaintiff again.  R. 248-49.  Dr. Graham reported

that plaintiff felt "very good" and exercised regularly.  R. 248.  Dr. Graham observed that

plaintiff had lost weight and noted that his gynecomastia (abnormal breast enlargement) had

been removed.  R. 248.  Dr. Graham noted that plaintiff exhibited paraspinal lumbar tenderness

and decreased range of motion in his back.  R. 248.  Dr. Graham also recorded that plaintiff's

hypertension and gastroesophageal reflux disease ("GERD") were under good control with plaintiff's current management.  R. 249.

On June 2, 2010, Dr. Graham met with plaintiff and discussed plaintiff's options for controlling his back pain with narcotics, surgery, and epidurals.  R. 250-51.

On July 22, 2010, plaintiff saw Dr. Graham to discuss chronic back and ankle pain, and pain across the top of his foot.  R. 252.  Plaintiff explained that he continued to experience pain despite having cortisone shots, taking oral medication, and losing weight.  R. 252.  A back examination revealed paraspinal lumbar tenderness and decreased range of motion.  R. 252. Plaintiff's neurological examination was unremarkable and his extremities showed no clubbing or edema.  R. 252.

On August 9, 2010, plaintiff visited Dr. Graham after he suffered a right-side groin pull. R. 254-55.  Plaintiff reported that this injury caused him to walk a little less than before, but he maintained most of the same activity level.  R. 254.  Plaintiff used an ace bandage and an analgesic heat rub to manage the injury.  Dr. Graham observed a guarded gait due to pain and right hamstring tenderness, but no effusion, ecchymosis, or deformities in his right hip.  R. 254.

On August 25, 2010, plaintiff reported to Dr. Graham for a complete physical examination and to get a letter attesting to his "employability or lack thereof."  R. 256. Plaintiff's physical examination showed a normal range of motion in his neck, regular heartbeat, normal gait and motor strength, normal upper and lower extremity joints, normal L-S spines, and unremarkable knees, feet, hands, and chest.  R. 258.  Plaintiff's straight leg raise test ("SLR") was also normal.  R. 257.  Plaintiff reported pain in his spine when bending, and Dr. Graham found sacroiliac ("SI") joint tenderness when examining plaintiff's back.  R. 257.

On September 17, 2010, plaintiff was examined by the VA regarding complaints of foot

pain.  R. 280.  Plaintiff identified pain while standing, walking, and at rest, stiffness, and a lack

of endurance.  R. 282.  Examiners determined that plaintiff possessed an antalgic gait with use of

bilateral ankle braces and a walking stick.  R. 286.  A physical examination of his feet revealed

no evidence of painful motion, swelling, instability, or weakness, but did reveal evidence of

tenderness and abnormal weight bearing.  R. 283-85.  Plaintiff exhibited normal sensory function

in all extremities and normal muscle tone, with no atrophy.  R. 300-01.

On October 8, 2010, plaintiff underwent an MRI that showed a "[s]table appearance as

compared to the prior study of 03/26/10, as described."  R. 414.

On October 22, 2010, plaintiff met with Dr. Graham for a follow-up appointment.  He

reported that his pain levels remained the same, but he continued to exercise regularly, including

in the pool, because it "keeps him mentally and physically balanced."  R. 260.  Dr. Graham noted

that plaintiff's back exhibited paraspinal lumbar tenderness.  R. 261.   Dr. Graham found no

clubbing or edema in plaintiff's extremities and reported that his hypertension and GERD were

stable.  R. 261.

On January 7, 2011, the VA issued a decision increasing plaintiff's "service-connected

disability evaluation" to 100 percent.  R. 163, 170.  As part of this evaluation, the VA indicated

that plaintiff's bilateral pes planus (flat foot) with history of heel spurs was increased to 30

percent disabling, his right ankle sprain was restored to 10 percent disabling, his left-wrist

tendonitis was restored to 10 percent disabling, and his lumbrosacral strain with degenerative

disc disease of lumbar spine and intervertebral disc syndrome was increased to 40 percent

disabling.  R. 166.

On February 7, 2011, plaintiff visited Dr. Graham complaining of right shoulder pain that

occurred on a daily basis, though he reported that a transcutaneous electrical nerve stimulation

("TENS") unit was "helping somewhat."  R. 262.  Plaintiff reported continuing back pain, but expressed resistance to receiving steroid treatment.  R. 262.  Dr. Graham's examination of plaintiff showed normal range of motion of the spine, no costovertebral angle ("CVA") tenderness, no clubbing or edema in his extremities, good range of motion in his right shoulder, and tenderness in his acromioclavicular ("A/C") joint.  R. 262.  Dr. Graham prescribed nonsteroidal anti-inflammatory drugs for plaintiff's shoulder pain.  R. 263.

On February 20, 2011, plaintiff reported to the emergency room with rectal pain.  R. 342. He was diagnosed with a perianal abscess.  R. 344.  Subsequently, he underwent a procedure under anesthesia involving an incision and drainage of the abscess.  R. 318.  Treatment notes from March 17, 2011 indicated that plaintiff's exam wound was healing well, drainage had ceased, and plaintiff did not feel pain in that area.  R. 311.

On May 9, 2011, plaintiff visited Dr. Graham, who noted that, while plaintiff continued to experience chronic back and shoulder pain, both were manageable with regular exercise and analgesics.  R. 381.  Accordingly, Dr. Graham reported that plaintiff's back pain was under "good control" and recommended that plaintiff continue his current management plan.  R. 382. A back examination showed normal range of motion of the spine and no CVA tenderness.  R. 381.  In addition, plaintiff's neurological examination was "unremarkable," and there was no clubbing or edema in plaintiff's extremities.  R. 381.

On December 20, 2011, plaintiff returned to the VA emergency room complaining of back pain that set in after he bent over to lift a fifty pound speaker.  R. 431.  A back examination revealed tenderness in the lower lumbar and sacral area, no CVA tenderness, negative straight leg raise to 75 degrees, flexion of the spine to 65 degrees, and symmetrical reflexes.  R. 433. Plaintiff was subsequently diagnosed with acute lower back pain and chronic degenerative disc

disease of his lumbar spine and sciatic pain.  R. 433.  He was discharged in "satisfactory" condition on the same day.  R. 433.

On March 8, 2012, plaintiff saw Dr. Graham for a routine visit, where he reported chronic back pain.  R. 760.  A back examination showed normal range of motion of the spine, no CVA tenderness, normal peripheral pulses, and no clubbing or edema in his extremities.  R. 760.

The medical records show that plaintiff did not report to Dr. Graham again until January 29, 2013, approximately one month after plaintiff's date last insured ("DLI"), where he received a complete physical examination.  R. 883.  Plaintiff reported chronic back pain, which had improved, and pain in his right shoulder and elbow from weight training.  R. 883.  A review of symptoms noted that plaintiff suffered from no depression or panic.  R. 884.  A back examination showed spine pain upon bending and SI joint tenderness, but no CVA tenderness, and normal SLR.  R. 884.  Dr. Graham advised plaintiff to continue his current plan to manage back pain and apply a heating pad to joint pain in his shoulder.  R. 885.

On February 18, 2014, plaintiff reported for a routine visit to Dr. Graham, complaining of varicose veins and lower back pain.  R. 887.  Plaintiff explained that he dealt with both through exercise.  R. 887.  Dr. Graham indicated that plaintiff's back pain was stable and referred him to a vascular surgeon for treatment of his varicose veins.  R. 888.

###### 2.    *Plaintiff's Mental Impairments*

Although Dr. Graham's treatment of plaintiff focused mostly on his musculoskeletal issues, Dr. Graham also documented plaintiff's symptoms of PTSD, for which he was diagnosed prior to the relevant period.[2]  R. 245.  On August 25, 2010, Dr. Graham noted that plaintiff's PTSD was stable and required no intervention.  R. 258.  In the letter Dr. Graham prepared at

---

[2] The record shows that, on February 4, 2009, plaintiff was diagnosed with PTSD after undergoing a PTSD consultation at the VA.  R. 199.

plaintiff's request, he noted that plaintiff "commonly deals with PTSD symptoms such as anxiety, mood changes and irritability, nightmares and insomnia" that affect "his sleep, focus, ability to concentrate, [and] stability of mood." R. 198.

On November 22, 2010, plaintiff reported to Elaine M. Becher, M.D. ("Dr. Becher"), a psychiatrist. His initial chief complaint involved "irritable mood, don't like to be around people, kinda like a trust factor, probs with sleep." R. 355. At this time, plaintiff took Citalopram for anxiety and depression, which he reported was "not helpful" and made him feel tired. R. 356. A mental examination revealed an anxious, slightly irritable mood, but no presence of psychotic symptoms or suicidal or homicidal ideation, appropriate affect, and good insight and judgment. R. 357. Dr. Becher diagnosed plaintiff with PTSD and depressive disorder, and she noted that his global assessment of function ("GAF") score was 55. R. 357.

On February 4, 2011, Dr. Becher examined plaintiff, where she noted an anxious, slightly irritable mood, but no evidence of psychotic symptoms, no suicidal or homicidal ideation, appropriate affect, and good insight and judgment. R. 351. Plaintiff reported that he had been participating in his church and taking college courses, and he had recently completed a coping and recovery group with the VA. R. 351. Dr. Becher diagnosed plaintiff with PTSD, chronic depressive disorder, and she reported that his GAF score was 55. R. 352. Plaintiff saw Dr. Becher again on April 8, 2011, where she made similar findings. R. 309-10.

On July 18, 2011, plaintiff reported to Dr. Becher for treatment, complaining of anger issues, irritability, "feeling bored and wanting to be by [himself]," problems sleeping, and moodiness. R. 447. He reported taking Citalopram. R. 447. After conducting a mental status exam that revealed anxious mood, but no psychotic symptoms or suicidal ideation, appropriate affect, and good insight and judgment, Dr. Becher diagnosed plaintiff with chronic PTSD,

depressive disorder, and noted that his GAF score was 55.  R. 448.

On October 17, 2011, plaintiff returned to Dr. Becher for "medication management."  R. 442.   Due to recent FDA concerns about Citalopram's potential to cause cardiac rhythm problems, Dr. Becher prescribed plaintiff Paroxetine for mood and anxiety.  R. 443-44.   A mental status exam revealed an anxious mood, but no psychotic symptoms, no suicidal or homicidal ideation, appropriate affect, and good insight and judgment.  R. 444.   Dr. Becher diagnosed plaintiff with chronic PTSD and depressive disorder.  R. 444.

On January 18, 2012, Dr. Becher saw plaintiff and recommended that he increase his Paroxetine dosage.  R. 421.   She again diagnosed plaintiff with chronic PTSD and depressive disorder.  R. 422.   His GAF score was 55.  R. 422.

On January 21, 2014, plaintiff reported for a depression and PTSD screening at the VA. R. 675.   Plaintiff reported nightmares, feeling detached from others, feeling distant, trouble falling asleep, some irritability, and some difficulty concentrating.  R. 675-77.   He tested negative for depression and positive for PTSD.  R. 675.

### C.   Medical Opinions and Residual Functional Capacity Assessments

On August 28, 2010, Dr. Graham wrote a letter upon plaintiff's request detailing plaintiff's treatment history.  R. 198.  Dr. Graham attested that he discussed or treated plaintiff's hypertension, GERD, sleep apnea, PTSD, and musculoskeletal issues.  R. 198.   Dr. Graham noted that plaintiff often exhibited symptoms of pain, stiffness, numbness, spasms, and limited mobility.  R. 198.   Dr. Graham opined that plaintiff's limitations would make it "extremely difficult for him to find employment which his conditions would not severely impact," and further that, "[m]aintaining any job, if found would be very problematic."  R. 198.

In the process of applying for VA disability benefits, plaintiff received a medical

assessment by Family Nurse Practitioner Margo P. Hazzard ("NP Hazzard"), on December 31, 2010, who opined that plaintiff's "service connected disabilities [were] at least as likely as not to prevent [plaintiff] from obtaining and maintaining substantially gainful employment."  R. 304. She also opined that plaintiff did "have the potential to possibly start another career that would be less taxing physically with vocational rehabilitation and education."  R. 304.

On June 2, 2011, a non-examining state agency psychological consultant, Daniel Walter, Psy.D., ("Dr. Walter"), conducted a mental residual functional capacity ("RFC") assessment and opined that plaintiff had no more than moderate limitations in understanding and memory, concentration and persistence, social interaction, and adaptation.  R. 66-67.

On June 3, 2011, a non-examining state agency physician, Robert Castle, M.D., ("Dr. Castle"), opined that plaintiff had the RFC to occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk for 6 hours per workday, sit for 6 hours per workday; frequently stoop, climb ramps and stairs, crouch, kneel, and crawl; and occasionally climb ladders, ropes, and scaffolds.  R. 65.

On July 28, 2011, a second, non-examining state agency psychologist consultant, David Deaver, Ph.D., ("Dr. Deaver"), assessed plaintiff's mental RFC.  Dr. Deaver also opined that plaintiff had no more than moderate limitations in understanding and memory, concentration and persistence, social interaction, and adaptation.  R. 79-80.

On July 29, 2011, a non-examining state agency physician, Leopold Moreno, M.D., ("Dr. Moreno"), opined that plaintiff had the RFC to occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk for 6 hours per workday, sit for 6 hours per workday; frequently stoop, climb ramps and stairs, crouch, kneel, and crawl; and occasionally climb ladders, ropes, and scaffolds.  R. 77-78.

### D.     Function Report

On March 21, 2011, plaintiff completed a function report.  R. 190-97.  He indicated that his daily activities included taking prescription medication in the morning, completing "small things around the house," reading to exercise his mind, and walking and exercising regularly within his capabilities.  R. 190.  Plaintiff wrote that he takes care of his pets by taking them for small walks and letting them ride in his vehicle, but that his wife and daughter provide primary care.  R. 191.  Prior to his injuries, plaintiff indicated that he had a successful military career, but had since found it difficult to secure gainful employment.  R. 191.

Plaintiff reported that his conditions affect his sleep by causing him to dream of his "experience in war."  R. 191.  Plaintiff explained that he has no problems with personal care, but must move "slowly at times" when he dresses so as "not causing undo pain to back and feet."  R. 191.  Plaintiff noted that his wife reminds him to take his PTSD medication when she notices a change in his behavior.  R. 192.

Plaintiff indicated that he can prepare his own meals, including sandwiches, frozen dinners, and complete meals with several courses, but, typically, his wife ensures that all preparations are completed beforehand so plaintiff can simply heat the meals.  R. 192.  With respect to house and yard work, plaintiff wrote that he helps with some cleaning and household repairs for three to four hours throughout the day, two or three times per week.  R. 192.  He reported that he goes outside daily and walks and drives a car.  R. 193.  Plaintiff indicated that he shops, in stores and by computer, for technology equipment.  R. 193.  With regards to money, plaintiff explained that he had the ability to pay bills, count change, handle a savings account, and use a checkbook and money orders.  R. 193.  He noted that his hobbies and interests include reading, watching television, listening to music, fishing, and walking.  R. 194.  He also reported

no changes in these activities since his illness began.  R. 194.  He indicated that he does not have problems getting along with others, but prefers to stay by himself because of his PTSD.  R. 195.

Plaintiff stated that his injuries affect his ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, concentrate, and get along with others.  R. 195.  He specified that he has respect for authority figures, but does not tolerate disrespect.  R. 196.  Plaintiff reported that stress, changes in his routine, and being around large groups of people aggravate his PTSD symptoms.  R. 196.  He indicated that he uses a doctor-prescribed cane and brace "when walking a distance and when body injuries dictate."  R. 196.

### E.      Testimony before the ALJ

#### 1.      The First Administrative Hearing

The first administrative hearing occurred on December 20, 2011, where the ALJ granted plaintiff's request for a continuance to obtain representation.  R. 56-58.

#### 2.      The Second Administrative Hearing

(Nathaniel Thomas)

At the second hearing, on February 27, 2012, plaintiff testified that he currently held a valid driver's license without any restrictions and had driven as far as Richmond within the last year.  R. 35.  On a typical day, plaintiff reported that he stretched, made coffee, and read the news.  R. 36.  At the time of the hearing, plaintiff testified that he qualified as a full-time student and hoped to receive a degree in sociology after completing two more classes.  R. 36.  Plaintiff noted that he preferred online classes, rather than live classes, where he did not need to interact with others.   R. 46.  Plaintiff testified that his wife worked as an engineer at the Newport News Shipyard.  R. 39.  Plaintiff described his military service as a truck driver in the army, from which he retired in 2006 as a sergeant, first class.  R. 42-43.  Though not currently working at the

time of the hearing, plaintiff indicated that he received $3,200 a month in disability benefits from the VA and $1,800 a month in military retirement.  R. 39-40.  In his free time, plaintiff specified that he volunteered at the VA, about two hours a month, to assist individuals and families dealing with PTSD.  R. 40.

Plaintiff reported that he felt unable to perform full-time work because of his mental impairments, including PTSD and depression, which made him feel "isolated," "withdrawn," and in "high-mode alert."  R. 41.  Plaintiff also noted that his medication for anxiety and depression made him feel tired and nauseous.  R. 45.  Plaintiff described his physical impairments, especially pain in his back and feet, as a hindrance to his ability to work and enjoy life with his family.  R. 41-43.  Due to his mental and physical impairments, plaintiff testified that he could not take more than the occasional vacation with his family or go out to restaurants more than once a month.  43-44.  Plaintiff indicated that he preferred to stay at home because of his inability to predict what occurrences would trigger his PTSD.  R. 44.

(Vocational Expert – Edith Edwards)

Edith Edwards, a vocational expert ("VE"), testified that a hypothetical person with plaintiff's age, education, and work experience, who was able to perform light work activity involving frequent crawling, crouching, kneeling, stooping, and climbing on ramps and stairs, but only occasional climbing on ladders, ropes, and scaffolds, occasional changes in the work setting, occasional work-related decision-making, and occasional interaction with the public, co-workers, and supervisors, could perform work as "a cleaner of housekeeping," laundry worker, unskilled office clerk, and bench assembler.  R. 49-50.  The VE also testified that those jobs existed in significant numbers in the national economy.  R. 50.

3.      *The Third Administrative Hearing*

(Nathaniel Thomas)

At the hearing, on March 25, 2014, plaintiff testified that he last worked in 2009, when he operated his own trucking business.  R. 145, 540.  Plaintiff indicated that his mental and physical problems precluded him from returning to work.  R. 539.  With respect to his daily activities, plaintiff testified that he gets up in the morning, takes medication, and stretches before completing "low impact" chores around the house and reading.  R. 537.  Plaintiff affirmed that he has no restrictions on his driver's license.  R. 537.  Plaintiff indicated that he uses a TENS unit once or twice daily for about 30 minutes.  R. 547-48.  Plaintiff stated that he experiences a "bad day," about once a week, where he feels despairing and overwhelmed.  R. 543.  He also reported feelings of anxiety and irritability.  R. 545.  Plaintiff testified that he takes medication for anxiety that makes him feel zoned out during the day.  R. 545-46.  He also reported feeling tired and "groggy" during the day due to "sleep apnea," which keeps him from sleeping at night. R. 545-46.  Plaintiff stated that he prefers to be by himself, where he feels safest.  R. 547. Plaintiff also reported that he suffers from physical ailments, such as back pain, shoulder pain, lower extremity pain, and, recently, swollen veins in his legs and pain in his left hip.  R. 547-50.

Nevertheless, plaintiff testified that he completed his online Bachelor of Arts degree in sociology at Saint Leo's University in March 2012.  R. 537-38.  Plaintiff reported taking a combination of online and in-person classes and graduating with a 2.98 GPA.  R. 538, 556. When asked by the ALJ whether he had attempted to look for a job since obtaining his degree, plaintiff replied that he had not because he felt "totally disabled" based on "the evidence from the VA."  R. 538.  When asked to elaborate, plaintiff reported limited mobility, PTSD, depression, and stated that he felt that he would be a drain on any organization.  R. 539.  Plaintiff

testified that he receives $4,200 in income every month, after taxes, from military retirement

benefits and VA disability benefits, which allows him to pay his mortgage and car payment.  R.

540.

(Vocational Expert – Linda Augins)

Linda Augins, a VE, testified that a hypothetical person with plaintiff's age, education,

and work experience, who was able to perform light work activity involving frequent crawling,

crouching, kneeling, stooping, and climbing on ramps and stairs, but only occasional climbing on

ladders, ropes, and scaffolds and only occasional interaction with the public and co-workers,

could perform unskilled, light jobs, including work as a labeler, price marker, and dining room

attendant.  R. 552-53.  The VE also testified that those jobs existed in significant numbers in the

national economy.  R. 553.

### III. THE ALJ's DECISION

To evaluate plaintiff's claim of disability[3], the ALJ followed the sequential five-step

analysis set forth in the SSA's regulations for determining whether an individual is disabled.  *See*

20 C.F.R. §§ 404.1520(a) and 416.920(a).  Specifically, the ALJ considered whether plaintiff:

(1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an

impairment that meets or medically equals a condition within the SSA's listing of official

impairments; (4) had an impairment that prevents him from performing any past relevant work;

---

[3] To qualify for SSI and/or DIB, an individual must meet the insured status requirements of the
Social Security Act, be under age sixty-five, file an application, and be under a "disability" as
defined in the Act.  "Disability" is defined, for the purpose of obtaining disability benefits, as the
inability to do any substantial gainful activity, by reason of any medically determinable physical
or mental impairment which can be expected to result in death or which has lasted or can be
expected to last for a continuous period of not less than twelve months.  20 C.F.R. § 404.1505(a);
*see also* 42 U.S.C. §§ 423(d)(1)(A), 416(i)(1)(A).  To meet this definition, the claimant must
have a "severe impairment" making it impossible to do previous work or any other substantial
gainful activity that exists in the national economy.

and (5) had an impairment that prevents him from engaging in any substantial gainful employment. R. 496-509.

The ALJ found that plaintiff met the insured requirements[4] of the Social Security Act through December 31, 2012, and he had not engaged in substantial gainful activity since October 29, 2009, his alleged onset date of disability. R. 496. At steps two and three, the ALJ found that plaintiff had the severe impairments of lumbar degenerative disc disease, PTSD, depression (not otherwise specified ("NOS")), and obesity, but that these impairments did not singly or in combination meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, as required for a finding of disability at step three. R. 496-500. (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). The ALJ determined that plaintiff's remaining impairments (bilateral pes planus with heel spurs, left wrist tendonitis, sleep apnea, gynecomastia, GERD, and varicose veins) were non-severe because they did not substantially interfere with plaintiff's ability to perform basic work activities, required no significant medical treatment, or occurred well-after plaintiff's date last insured on December 31, 2012. R. 497-99. The ALJ also noted that plaintiff's initial claim for disability based on "unemployability" is a VA designation rather than a medically determinable impairment. R. 497. The ALJ next found that plaintiff possessed an RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b), involving frequent crawling, crouching, kneeling, stooping, and climbing on ramps and stairs, but only occasional climbing on ladders, ropes, and scaffolds and only occasional interaction with the public and co-workers. R. 501. At step four of the analysis, the ALJ determined that plaintiff was unable to perform any past relevant work that requires heavy exertion, including

---

[4] In order to qualify for DIB, an individual must also establish disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

work as a truck driver, truck driver supervisor, and small business owner/truck driver, because his RFC encompassed only the performance of a reduced range of light work. R. 508. Finally, at step five, and after considering plaintiff's age, education, work experience, and RFC, the ALJ found that there are other light, unskilled jobs (such as labeler, price marker, and dining room attendant) existing in significant numbers in the national economy that plaintiff could perform. R. 509. Accordingly, the ALJ concluded that plaintiff was not under a disability from October 29, 2009 through the date of the ALJ's decision and was ineligible for a period of disability or DIB benefits. R. 509-10.

## IV. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that

decision falls on the Secretary (or the [Secretary's] designate, the ALJ)." *Craig*, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Coffman,* 829 F.2d at 517.

## V. ANALYSIS

### A.  The ALJ Did Not Err in Assigning the VA Decision Slight Weight

In this case, the ALJ's decision to afford the VA decision slight weight was consistent with the standard set out in *Bird v. Commissioner of Social Security*. 699 F.3d 337, 343 (4th Cir. 2012). In *Bird*, the Fourth Circuit addressed, for the first time, the weight that the SSA must afford to a VA disability rating. *Id.* After recognizing that both the VA and the SSA "serve the same governmental purpose of providing benefits to persons unable to work because of a serious disability," and further that "the purpose and evaluation methodology of both programs are closely related," the court held that the SSA must give "substantial weight" to the VA disability rating in making its own disability determination. *Id.* at 343. Nonetheless, the court explained that, because "the SSA employs its own standards for evaluating a claimant's alleged disability" and "the effective date of coverage for a claimant's disability under the two programs will vary," the SSA need not give substantial weight to the VA disability rating when the record "clearly demonstrates" that less weight is appropriate. *Id.* at 343. In other words, the Fourth Circuit has clarified that the ALJ must give the VA decision substantial weight or give a detailed

explanation for refusing to do so.  *Id.*; *see also Wyche v. Colvin*, No. 4:13cv43, 2014 WL 1903106, at *10 (E.D. Va. Apr. 30, 2014) (finding that if an ALJ's opinion does not give substantial weight to the VA's rating determination, "then it must be evident from the opinion itself why the ALJ departed from that standard").

Courts have identified several grounds that may justify an ALJ's grant of lesser weight to the VA decision.  One factor, identified specifically in *Bird*, is that "the SSA employs its own standards for evaluating a claimant's alleged disability" and those different standards may justify a grant of lesser weight.  *Bird*, 699 F.3d at 343.  Other grounds potentially justifying departure from the substantial weight standard include the ALJ's rejection of a medical opinion relied on by the VA or the ALJ's consideration of additional medical evidence not before the VA.  *Wyche*, 2014 WL 1903106, at *12.

In this case, the ALJ gave three reasons for granting the VA decision slight weight.  First, the ALJ noted that the VA based its decision on plaintiff's subjective complaints that the ALJ found not entirely credible.  R. 505-07.  Second, the ALJ explained that he gave less weight to medical opinions that formed the basis for the VA decision.  R. 507.  Third, the ALJ considered new evidence not before the VA at the time of the 2011 decision.  R. 508.

The Court finds the ALJ's explanation for his departure from the substantial weight standard sufficiently detailed, such that it is clear to the Court why he departed from that standard.  *See Wyche*, 2014 WL 1903106, at *10.  First, the ALJ explained that, while the VA resolved all reasonable doubt about plaintiff's credibility in plaintiff's favor, the ALJ was not inclined to do so.  R. 506-07.  The ALJ identified plaintiff's "general demeanor at the hearing," the lack of objective medical evidence to support plaintiff's subjective complaints, and plaintiff's initial identification of the VA decision as the reason why he felt permanently disabled, as

reasons why the ALJ found plaintiff's subjective complaints not entirely credible.  R. 507.  The ALJ further explained that, unlike the VA, he did not need to resolve doubts in plaintiff's favor because the VA uses the more deferential benefit of the doubt standard in evaluating the credibility of subjective complaints compared to the preponderance of the evidence standard employed by the SSA.  R. 506; *see also Littlejohn v. United States*, 321 F.3d 915, 924 (9th Cir. 2003) (stating that the VA's benefit of the doubt standard "imposes a lower burden of proof on claimants" than does the preponderance of the evidence standard).  As explained in the *Bird* opinion itself, the different standards imposed by the VA and SSA may justify a grant of lesser weight to the VA decision.  *Bird*, 699 F.3d at 343.

Second, the ALJ discounted the VA's reliance upon the opinions of Dr. Graham and NP Hazzard.  R. 507.  The ALJ explained that the VA decision cited statements from Dr. Graham that he found warranted only minimal weight.[5]  R. 507.  Moreover, the ALJ did not fully agree with NP Hazzard's assessment of plaintiff at the VA, when she opined that plaintiff's "service connected disabilities are at least as likely as not to prevent veteran from obtaining and maintaining substantially gainful employment," because the ALJ found plaintiff's subjective complaints significantly less credible than NP Hazzard found them.  R. 507.  The ALJ's assessment of these two medical opinions supports his decision to award slight weight to the VA decision because an ALJ's rejection of a medical opinion relied on by the VA may warrant a different result in the SSA proceeding.  *See Wyche*, 2014 WL 1903106, at *12.

Third, the ALJ effectively explained that he reached a different result from the VA, in part, because he considered new evidence not before the VA at the time of the decision in 2011.  R. 508.  The ALJ noted that, while the 2011 VA decision relied on medical records from 2006 to

---

[5] A more complete discussion of the ALJ's assessment of Dr. Graham's opinion is discussed below.

2010, the ALJ considered more recent medical records, including treatment records from 2012 to 2014.  R. 508.  The Court agrees with the ALJ's determination that plaintiff's more recent treatment records reveal marked improvement in plaintiff's condition.  R. 501-02, 508.  The records show that plaintiff visited Dr. Graham only annually between 2012 and 2014, which suggests improvement in his condition.  R. 881-88.  Furthermore, Dr. Graham's notes from these annual visits indicate that plaintiff's condition grew increasingly stable.  R. 881-88.  For example, Dr. Graham's treatment notes from 2014 describe plaintiff's back pain and GERD as stable and do not even list PTSD as one of plaintiff's conditions.  R. 887.  Upon consideration of the ALJ's detailed explanation, the Court finds that the ALJ did not err in assigning the VA decision slight weight.

    **B.**    **The ALJ Properly Considered and Explained the Weight Given to Dr. Graham's Opinions**

Plaintiff also challenges the ALJ's decision by arguing that the RFC finding fails to account for plaintiff's limitations and is unsupported by substantial evidence, due to the ALJ's failure to adhere to the treating physician rule and his attribution of "minimal weight" to Dr. Graham's opinions.  Plaintiff argues that the ALJ inadequately explained his decision to afford minimal weight to Dr. Graham's opinions and failed to apply the relevant factors outlined in the Social Security regulations.

The regulations provide that, after step three of the ALJ's five-part analysis but prior to deciding whether a claimant can perform past relevant work at step four, the ALJ must determine a claimant's RFC.  20 C.F.R. § 404.1545(a) and § 416.945(a).  The RFC is a claimant's maximum ability to work despite his limitations.  *Id.* § 404.1545(a)(1) and § 416.945(a)(1). The ALJ then uses that RFC to determine whether the claimant can perform his past relevant work.  *Id.* § 404.1545(a)(5) and § 416.945(a)(5).  The determination of RFC is based upon a

consideration of all the relevant medical and other evidence in the record. 20 C.F.R. § 404.1545(a)(3) and § 416.945(a)(3).[6]

In making the RFC determination, the ALJ must consider the objective medical evidence in the record, including the medical opinions of treating providers. A treating provider's opinion merits "controlling weight," under federal regulations and Fourth Circuit authority, if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." 20 C.F.R. § 404.1527(c)(2) and § 416.927(c)(2); *see also Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Conversely, "if [a] physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. However,

> a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.

SSR 96-2p, 61 Fed. Reg. 34490, 34491 (July 2, 1996).

Therefore, even if a treating provider's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors" provided by the regulations. *Id.* at *5. Those factors are: (1) the examining relationship, giving more weight to sources who have examined a claimant; (2) the treatment relationship, looking at the length, nature, and extent of the treatment relationship; (3) supportability, based upon the extent of the evidence presented in support of the opinion; (4) consistency with the record; and (5) the

---

[6] "Other evidence" includes statements or reports from the claimant, the claimant's treating or nontreating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(a) and § 416.929(a).

specialization of the physician.   20 C.F.R. § 404.1527(c) and § 416.927(c); *accord Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).

By regulation, the ALJ must explain in his decision the weight assigned to *all* opinions, including treating sources, non-treating sources, state agency consultants, and other non-examining sources.   20 C.F.R. § 404.1527(e)(2)(ii) and § 416.927(e)(2)(ii).   Therefore, when the ALJ's decision is not fully favorable to the claimant, the decision must contain

> specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 61 Fed. Reg. 34490, 34492 (July 2, 1996).   This specificity requirement is necessary because the reviewing court

> face[s] a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."

*Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

In assessing plaintiff's RFC, the ALJ considered all of the relevant medical and other evidence, and explained the weight he assigned to each medical opinion.   With respect to Dr. Graham, the ALJ assigned "minimal weight" to Dr. Graham's letter, dated August 28, 2010, indicating that "it would be extremely difficult for [plaintiff] to find employment which his conditions would not severely impact."   R. 198, 505.   As grounds therefor, the ALJ noted that Dr. Graham's opinion does not specify plaintiff's work-related limitations and does not find support in Dr. Graham's own treatment records or the VA record, which reflects conservative

care and few objective findings. R. 505.

Plaintiff argues that, in assigning minimal weight to Dr. Graham's opinion letter, the ALJ failed to properly evaluate the factors, noted above, governing the assignment of weight to a treating provider's opinion that is not accorded controlling weight. 20 C.F.R. §§ 404.1527(c)(2)-(c)(6), 416.927(c)(2)-(c)(6) (analyzing the treatment relationship, the support provided for the opinion, its consistency with the record, the credentials of the provider, and other appropriate factors). The Court disagrees for the following reasons.

First, the Court is satisfied that the ALJ considered the nature, length, extent, and frequency of the treatment relationship between plaintiff and Dr. Graham because the ALJ referred to Dr. Graham as plaintiff's primary care physician and acknowledged that Dr. Graham had treated plaintiff for four years at the time he wrote his August 28, 2010 opinion letter. R. 501, 505.

With respect to consistency, the ALJ properly found Dr. Graham's August 28, 2010 opinion letter to be inconsistent with the substantial evidence of record concerning plaintiff's physical impairments. Dr. Graham asserted that plaintiff's physical limitations, and the accompanying daily pain, impacted his ability to "ambulate, lift objects [and] drive." R. 198. This statement, however, contradicts evidence in the record that plaintiff remained largely independent. In plaintiff's function report, dated March 21, 2011, plaintiff indicated that he walks and exercises regularly, drives, assists with household chores and repairs, and fishes. R. 190-97. Shortly thereafter, on May 9, 2011, plaintiff reported to the emergency room upon developing back pain after lifting a 50 pound speaker at church. R. 431. As noted by the ALJ, plaintiff's willingness to lift a 50 pound speaker at all casts doubt on how severely plaintiff's physical impairments impacted his ability to lift objects. R. 501.

Furthermore, Dr. Graham's own treatment records are inconsistent with his opinion that plaintiff's physical impairments would severely impact plaintiff's ability to find employment.  R. 198.  While plaintiff has indeed suffered from chronic back pain, Dr. Graham's treatment records indicate conservative treatment with no surgery referrals.  In 2010, Dr. Graham reported some "paraspinal lumbar tenderness" and decreased range of motion in plaintiff's back.  R. 262, 381, 760.  By 2011, however, Dr. Graham described normal range of motion of the spine and no CVA tenderness, which suggests that plaintiff's chronic back pain did not cause lasting debilitating effects.  R. 244, 248, 252.  On May 9, 2011, Dr. Graham indicated that plaintiff's back and shoulder pain were both manageable with regular exercise and analgesics and, therefore, under "good control."  R. 381-82.  The ALJ also noticed that, from 2012 to the present, plaintiff visited Dr. Graham only on an annual basis, a pattern that detracts from plaintiff's claims of lasting and debilitating chronic pain.

The ALJ also properly found Dr. Graham's August 28, 2010 opinion letter to be inconsistent with the substantial evidence of record concerning plaintiff's mental impairments.  Once again, Dr. Graham's assessment of plaintiff's mental functioning is inconsistent with his own treatment records.  While Dr. Graham asserted that plaintiff commonly deals with severe PTSD symptoms in his August 28, 2010 letter, Dr. Graham's own treatment record, dated three days prior, indicated that plaintiff's PTSD was "stable" and that no intervention was necessary.  R. 258.  Dr. Graham's report, dated January 29, 2013, included a "review of symptoms" section that signified no depression or panic.  R. 884.  Additionally, in the assessment section of Dr. Graham's notes from the same day, he did not list PTSD as one of plaintiff's treating conditions.  R. 885.  As noted by the ALJ, "the picture painted here is quite different than the individual Dr. Graham described as having to deal with 'PTSD symptoms such as anxiety, mood changes and

irritability, nightmares and insomnia' in the August 28, 2010 letter." R. 501.

Furthermore, Dr. Graham's assessment of the impact plaintiff's PTSD symptoms had on his sleep, focus, ability to concentrate, and stability of mood, did not account for plaintiff's pursuit of a college degree, which, as noted by the ALJ, he received in March 2012. R. 503. Plaintiff's apparent ability to study, attend live and online classes, and graduate from college with a 2.98 GPA do not suggest that his mental impairments have considerably affected his ability to concentrate and focus, as Dr. Graham suggested. R. 198.

Instead, in assessing plaintiff's RFC, the ALJ gave greater weight to the opinions of state agency physicians, Dr. Castle and Dr. Moreno, and state agency psychologists, Dr. Walter and Dr. Deaver. The ALJ accorded moderate weight to the opinions of state agency physicians, Dr. Castle and Dr. Moreno, who determined that plaintiff had the RFC to occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk for 6 hours per workday, sit for 6 hours per workday; frequently stoop, climb ramps and stairs, crouch, kneel, and crawl; and occasionally climb ladders, ropes, and scaffolds. R. 65, 77-78. Based on plaintiff's "sporadic use of narcotic analgesics and his subjective complaints," the ALJ's RFC contained increased limitations beyond those Dr. Castle and Dr. Moreno identified. R. 504. The ALJ also conferred moderate weight to state agency psychologists, Dr. Walter and Dr. Deaver, who determined that plaintiff had no more than moderate limitations in understanding and memory, concentration and persistence, social interaction, and adaptation. R. 66-67, 79-80. In addition, the ALJ assigned only slight weight to NP Hazzard's opinion that plaintiff's "service connected disabilities are at least as likely as not to prevent veteran from obtaining and maintaining substantially gainful employment," having found that this opinion was based primarily on plaintiff's subjective complaints that the ALJ found "excessive" and "not credible." R. 304, 505.

For the reasons discussed above, the Court also agrees with the ALJ's finding that Dr. Graham's opinion was not well-supported, as it consisted primarily of unexplained conclusions without a list of specific functional limitations that the ALJ could consider.  R. 198, 505.

Lastly, the ALJ's identification of Dr. Graham as a doctor and plaintiff's "primary care physician outside of the VA system" assures the Court that the ALJ considered Dr. Graham's status in assessing his opinion.

Based upon the foregoing analysis, the Court finds that substantial evidence supports the ALJ's decision to give Dr. Graham's August 28, 2010 opinion letter minimal weight.

### C.      The ALJ Properly Assessed Plaintiff's Credibility

Plaintiff next asserts that the ALJ erred in finding his subjective complaints about the intensity, persistence, and limitations resulting from his symptoms less than entirely credible.

To make his credibility determination, the ALJ engaged in the two-step inquiry detailed in 20 C.F.R. § 404.1529 by evaluating:   (1) whether an underlying medically determinable impairment was shown that could reasonably be expected to produce the claimant's symptoms, and (2) if so, the extent to which such symptoms limited the claimant's functioning and ability to work, based upon their intensity, persistence, and limiting effects.  *See Craig*, 76 F.3d at 594-95. The ALJ found that plaintiff's impairments could reasonably be expected to cause his symptoms, but that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent with the above residual functional capacity assessment."[7]  R. 503.

---

[7] While neither party raised this issue, the Court notes that this language raises a possible analytical error of the type identified by the Fourth Circuit in *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015).  In *Mascio*, the Fourth Circuit criticized an ALJ's use of "boilerplate language" indicating that a claimant's statements are not credible "to the extent that they are inconsistent with the [RFC]" because such language implied that an ALJ determined a claimant's ability to

This Court must give great deference to the ALJ's credibility determinations.  The Fourth Circuit has held, "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'"  *Edelco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997) (internal citations omitted).  Therefore, this Court must accept the ALJ's assessment of plaintiff's credibility unless it is unreasonable, contradicts other factual findings, or is based on an insufficient reason.  *Id.*

Plaintiff first attacks the ALJ's credibility determination by asserting that the ALJ did not adequately explain his reasons for finding plaintiff's testimony less than entirely credible.  The Court disagrees.  In making his credibility determination, the ALJ properly considered the objective medical and other evidence of record, including the pertinent factors specified by regulation, such as plaintiff's daily activities, the duration and intensity of his symptoms, his medication and other treatments received, and the actions taken by plaintiff to deal with his impairments.  *See* 20 C.F.R. § 404.1529(c).  The ALJ explained that many of plaintiff's activities, such as playing the guitar regularly with a group at church, volunteering once a month, and successfully graduating from college, contradicted plaintiff's assertion that his PTSD caused

---

work first and then used that to assess a claimant's credibility.  *Mascio*, 780 F.3d at 639 (noting "this boilerplate 'gets things backwards' by implying 'that ability to work is determined first and is then used to determine the claimant's credibility'") (citation omitted).  The Fourth Circuit also concluded that any error associated with this boilerplate language was harmless if the ALJ "properly analyzed credibility elsewhere." *Id.*  In other words, "*Mascio* holds that an ALJ's analysis must adequately explain the findings made as to plaintiff's credibility beyond the 'vague (and circular) boilerplate statement that he did not believe any claims of limitations beyond what he found when considering [plaintiff's] residual functional capacity.'"  *Mitchell v. Colvin*, 2015 WL 5690899, at *8-9 (W.D. Va. Sept. 28, 2015) (holding that the ALJ's decision did not violate *Mascio*, despite her use of the boilerplate language criticized in *Mascio*, because she sufficiently explained her assessment of plaintiff's credibility).  Here, the Court finds ample evidence that the ALJ did not engage in the illogical analysis criticized by the Fourth Circuit.  As discussed below, the ALJ carefully and thoroughly considered plaintiff's symptoms, the medical and other evidence of record, the opinion evidence, plaintiff's hearing testimony, his treatment history and progression, and his daily activities in assessing his credibility.  R. 503-05.

him to continually isolate and withdraw from others.  R. 504.  Further, the ALJ determined that

plaintiff's activities, such as interacting with family, completing household chores, driving,

attending medical appointments alone, and participating in a music program at church,

undermined plaintiff's claims of constant, debilitating pain.  R. 504.  The ALJ also noted that

plaintiff's medical records failed to support many of the symptoms to which plaintiff testified,

such as inability to sleep, incapacitating daily pain, nausea as a side effect of his pain medication,

and daytime fatigue.  R. 503.

Plaintiff further challenges the ALJ's credibility determination by alleging that "the

ALJ's demeanor and attitude towards [plaintiff] was clearly argumentative and created a hostile

environment."  ECF No. 10 at 25.  However, the Court's review of the record does not indicate

that the ALJ "hammered him with combative questions in an attempt to trivialize [plaintiff's]

impairments," as plaintiff alleges.  ECF No. 10 at 25-26.  The Court's review of the hearing

transcript reveals that the ALJ asked appropriate questions and thanked plaintiff for his time.  R.

533-50.  The hearing transcript suggests that, after not receiving a satisfactory answer initially,

the ALJ asked plaintiff multiple times to answer his question concerning why plaintiff had not

looked for a job after receiving a college degree.  R. 538.  While the Court understands that this

may have been a difficult question for plaintiff to answer, the transcript does not indicate that

this line of questioning rose to the level of "inappropriate hostility" that biased the proceedings

or prevented plaintiff from fully explaining his impairments.  *See Carter v. Astrue*, 2013 WL

1165172, at *8 (E.D. Va. March 20, 2013) (finding that plaintiff "failed to meet the heavy

burden of overcoming the presumption of honesty and integrity afforded to administrative

decisionmakers" because the ALJ's statements did not prevent plaintiff from fully developing the

factual record).

For these reasons, the Court finds that ample and substantial evidence supports the ALJ's credibility determination in this case.

## VI. RECOMMENDATION

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment (ECF No. 9) be DENIED, defendant's motion for summary judgment (ECF No. 11) be GRANTED, and the decision of the Commissioner be AFFIRMED.

## VII. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(c):

1.  Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules.  A party may respond to another party's objection within fourteen (14) days after being served with a copy thereof.

2.  A district judge shall make a *de novo* determination of those portions of this Report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this

court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).


                        /s/
                       Robert J. Krask
             United States Magistrate Judge

Norfolk, Virginia
January 7, 2016